**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| RONALD EVANS f/b/o The Ronald Evans IRA account #1713313<br><br>Plaintiff,<br><br>**vs.**<br><br>ERIK C. WEIR, ECW INVESTING, LLC, SC STRATEGIC OPPORTUNITY FUND, LLC, CHERRY BEKAERT LLP, JOHN AND JANE DOE CORPS 1-10 and JOHN AND JANE DOES 1-10,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**
(Jury Trial Demanded)

**TO:    DEFENDANTS, ERIK C. WEIR, ECW INVESTING, LLC, SC STRATEGIC OPPORTUNITY FUND, LLC, CHERRY BEKAERT LLP, JOHN AND JANE DOE CORPS 1-10 AND JOHN AND JANE DOES 1-10.**

**PLEASE TAKE NOTICE THAT** Plaintiff Ronald Evans ("Evans"), for the benefit of The Ronald Evans IRA account #1713313 (the "IRA"), complaining of Defendants Erik Weir ("Weir"), ECW Investing, LLC ("ECW Investing"), SC Strategic Opportunity Fund, LLC ("SCSOF"), and Cherry Bekaert LLP ("Cherry Bekaert" and, together with Weir, ECW Investing and SCSOF, "Defendants")), would respectfully show unto the Court:

## NATURE OF THE ACTION

1.      This action arises from an investment in SCSOF by the IRA made through a loan to SCSOF to finance a mixed-use development project in downtown Greenville, South Carolina (known collectively as the "Camperdown Project"). Evans is the beneficiary of the Ronald the IRA. Weir controls SCSOF and represented to Evans that SCSOF was the owner and developer of the land and improvements comprising the Camperdown Project and that no entity affiliated with him had ever defaulted on a promissory note to investors.

2.      Through this action, Evans seeks to address losses suffered by the IRA as a result of Weir's fraudulent conduct inducing Evans to cause the IRA to lend the principal sum of $260,000 to SCSOF pursuant to the terms of a Promissory Note (the "Note") executed by SCSOF in favor of the IRA on or about January 9, 2020, and to collect the amount due to the IRA pursuant to the Note, the maturity date of which was January 31, 2024, as well as all collection costs.

3.      Through this action, Evans also seeks to hold Cherry Bekaert to account for its negligence in performing audits of SCSOF, which failed to identify significant issues regarding SCSOF's ability to continue as a going concern and thereby induced Evans to extend the term of the Note to the detriment of the IRA.

4.      This action also seeks to hold Weir to account for his fraudulent statements regarding the payment history of entities affiliated with him, which induced Evans to agree to invest in SCSOF through the Note, and to void an effort by Weir to place his own interests ahead of the interests of Evans, the IRA, and the other SCSOF investors Weir solicited to fund the Camperdown Project when he obtained a series of mortgages through his personal investment vehicle, ECW Investing, on the Camperdown Project securing monies allegedly provided by Weir to fund the Camperdown Project when SCSOF had already suspended payment of quarterly payments required by the Note and when the Chief Compliance Officer and General Counsel of SCSOF had already admitted in writing that the Camperdown Project presented noteholders with "no recovery possibility."

PARTIES

5.      Plaintiff Ronald Evans is the beneficiary of the Ronald Evans IRA account #1713313, a self-directed IRA held by the Midland Trust Company, 1520 Royal Palm Square Boulevard, Suite 320, Fort Myers, Florida 33919, and is the real party in interest in this action.

Evans is a resident of the state of Florida.

6.     Upon information and belief, defendant Weir is a citizen and resident of Greenville County South Carolina.

7.     Upon information and belief, defendant ECW Investing, LLC is a South Carolina limited liability company whose principal place of business is in Greenville County, South Carolina.

8.     Upon information and belief, defendant SC Strategic Opportunity Fund LLC is a Delaware limited liability company with offices located at 201 RiverPlace, Suite 500, Greenville, South Carolina 29601.

9.     Upon information and belief, defendant Cherry Bekaert LLP is a North Carolina limited liability partnership with its principal place of business in Raleigh, North Carolina, and which maintains offices in South Carolina and continuously and systematically conducts business in South Carolina, including the audit work at issue in this action.

10.     John and Jane Doe Corps 1-10 are fictitious names representing unknown corporate entities, including corporate entities owned and/or controlled by Weir, SCSOF and/or insiders at SCSOF, that conspired with, assisted, participated in or benefited from the improper conduct alleged against SCSOF, Weir and Cherry Bekaert. Evans expects that the identity of John and Jane Doe Corps will become known through discovery in this action.

11.     John and Jane Does 1-10 are fictitious names representing unknown individuals who conspired with, assisted, participated or benefited from the improper conduct alleged against SCSOF, Weir and Cherry Bekaert.  Evans expects that the identity of John and Jane Does will become known through discovery in this action.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity

jurisdiction) in that the amount in controversy here exceeds seventy-five thousand an no one-hundredths dollars ($75,000.00) and in that there is complete diversity of citizenship between the plaintiff and the defendants.

13.     Venue is proper in the District of South Carolina under 18 U.S.C. § 1965 and 28 U.S.C. § 1391, in that it is the district in which Weir resides and in which the other defendants maintain their principal place of business and/or conduct business, in which each defendant is subject to personal jurisdiction at the time of the commencement of this action, and in which a substantial part of the events or omissions giving rise to this action occurred.

14.     This action is appropriately brought in the Greenville Division of the United States District Court for the District of South Carolina in that it is the division in which Weir resides and in which the other defendants maintain their principal place of business and/or conduct business.

## DETAILED ALLEGATIONS

15.     Evans is the beneficiary of the IRA and the real party in interest in this action.

16.     Throughout 2019, Weir solicited Evans to make investments in the Camperdown Project.

17.     The form of investment proposed by Weir was a loan evidenced by a promissory note made by SCSOF.

18.     Upon information and belief, SCSOF owns 50% of two entities that owned and were developing the land and improvements comprising the Camperdown Project.

19.     During the course of discussions regarding potential investments in SCSOF, Weir repeatedly represented to Evans that no entity associated with Weir had ever defaulted on a promissory note to an investor.

20.     This representation gave Evans comfort with regard to an investment in the form

of a promissory note since the promissory note Weir proposed to be made by SCSOF in favor of the IRA was to be an unsecured promissory note.

21.    Based on Weir's assurance regarding the track record of his projects and affiliated entities, specifically with regard to timely payment of all promissory notes financing them, Evans agreed to make an investment in the Camperdown Project through a loan from the IRA to SCSOF in the amount of $260,000.

22.    Upon information and belief, Weir's representations that no entity affiliated with him had ever defaulted on a promissory note were false when made and known by Weir to be false when made. Annexed hereto as Exhibit A is a true and correct copy of a lawsuit filed against a Weir-affiliated entity alleging default on a promissory note made in favor of an investor (the "Weir Default Lawsuit").

23.    Evans elected to provide the loan through his self-directed IRA account (the IRA).

24.    The loan was evidenced by the Note, made by SCSOF in favor of the IRA in the principal amount of $260,000, made as of January 9, 2020. A true and complete copy of the Note is annexed hereto as Exhibit B.

25.    The Note provided for interest on the principal amount in two forms.

26.    First, interest was to accrue at the rate of one- and one-half percent (1.5%) per calendar quarter.

27.    Second, additional interest was to accrue at the rate of six percent (6%) per year.

28.    All unpaid interest amounts were to be treated as unpaid principal and were to accrue interest in the same manner as the original principal amount.

29.    The Note required SCSOF to make quarterly payments to the IRA of $3,900.

30.    The Note was to mature, and all outstanding principal and interest was to be paid

to the IRA in full on January 31, 2022.

31.    The Note permitted SCSOF to extend the maturity date of the Note two times, for periods of one year each, provided that SCSOF gave written notice of its intent to extend the maturity date at least ten (10) days prior to the then-existing maturity date.

32.    The Note provides that if SCSOF elected to extend the maturity date, SCSOF would be required to continue making quarterly payments of $3,900 each quarter until the newly extended maturity date.

33.    The Note provides that if the final payment due on the maturity date was not paid within thirty (30) days of the maturity date SCSOF would be required to pay a late fee of $1,000.

34.    The Note provides that upon an Event of Default all amounts due and owing under the Note would become immediately due and payable.

35.    The Note provides that, among other conditions, an Event of Default will occur if SCSOF fails to make any payment required under the Note.

36.    The Note provides that, among other conditions, an Event of Default will occur if SCSOF is unable to pay or admits in writing that it is unable to pay its debts generally as they became due.

37.    The Note provides that the IRA is entitled to payment of all reasonable costs and expenses incurred by the IRA in the enforcement or collection of any of SCSOF's material obligations under the Note.

38.    On January 21, 2022, SCSOF extended the maturity date of the Note by one year, to January 31, 2023, by providing the required written notice to Midland Trust, the custodian of the IRA on January 21, 2022.

39.    In or about January 2023, SCSOF failed to make the quarterly payment due for the

fourth quarter of 2022.

40.     However, Evans elected not to pursue this Event of Default based on the non-payment because SCSOF represented in investor updates that it expected to refinance the Camperdown Project and/or sell some or all of the property and improvements comprising the Camperdown Project and would use the proceeds to pay noteholders in full.

41.     The reason Evans did not pursue the Event of Default was that all of the information available to him at the time indicated that SCSOF had a viable business plan to refinance the Camperdown Project which presented a reasonable likelihood that once that plan was executed SCSOF would be able to pay its obligations to Evans and other noteholders in full.

42.     At that time, Evans was unaware of any information that would call into question SCSOF's viability as a going concern or its ability to execute on the business plan that had been disclosed to Evans and, upon information and belief, other investors in SCSOF.

43.     In January 2023, SCSOF apparently desired to extend the maturity date of the Note another year until January 31, 2024, but did not provide timely notice of its intent to do so to Midland Trust as required by the Note.

44.     As a result, SCSOF did not have the right to extend the maturity date beyond January 31, 2023.

45.     However, when Evans received notice from Midland Trust in the Spring of 2023 that SCSOF had not provided the notice required to extend the maturity date of the Note, Evans agreed to waive the notice requirement and acquiesced in SCSOF's extension of the maturity date rather than seek immediate payment from SCSOF.

46.     In correspondence with Evans in May 2023, SCSOF represented to Evans that they had documented the extension with Midland Trust, the custodian of the IRA.

47. As with the missed fourth quarter of 2022 payment, Evans did not object to SCSOF's extension of the maturity date until January 31, 2024 based on SCSOF's failure to give timely notice or seek immediate payment on the Note.

48. Instead, Evans acquiesced in SCSOF's extension of the maturity date based on SCSOF's representations that it had a viable business plan to either refinance or sell some or all of the Camperdown Project which presented a reasonable likelihood that once that plan was executed SCSOF would be able to pay its obligations to Evans and other noteholders in full.

49. At the time, Evans was unaware of any information that would call into question SCSOF's viability as a going concern or its ability to execute on the business plan that had been disclosed to Evans and, upon information and belief, other investors in SCSOF.

50. Upon information and belief, Cherry Bekaert performed annual audits of SCSOF's financial statements for the calendar years ending 2021 and 2022 (the "Cherry Bekaert Audit Period").

51. Upon information and belief, for each year during the Cherry Bekaert Audit Period, Cherry Bekaert provided SCSOF with unqualified "clean" audit opinions.

52. Upon information and belief, the audit opinions provided by Cherry Bekaert during the Cherry Bekaert Audit Period stated that in Cherry Bekaert's opinion SCSOF's financial statements fairly presented SCSOF's financial condition and the results of its operations for the relevant audit period.

53. Relevant auditing standards require independent audit firms like Cherry Bekaert to consider as part of each audit performed whether there are concerns about the audited entity's ability to continue as a going concern for the twelve (12) month period following the period for which the audit is performed.

54. If the auditor determines that there are questions regarding the audited entity's

ability to continue as a going concern during the next twelve (12) months, the auditor is required to note this information in the independent auditor's report through specific language and disclosures.

55.    Upon information and belief, the audit opinions provided by Cherry Bekaert to SCSOF during the Cherry Bekaert Audit Period did not disclose concerns regarding SCSOF's ability to continue as a going concern.

56.    Upon information and belief, the audit opinion provided by Cherry Bekaert to SCSOF for the period ending December 31, 2021 was an unqualified "clean" opinion that did not disclose any questions about SCSOF's ability to continue as a going concern.

57.    Upon information and belief, the audit opinion provided by Cherry Bekaert to SCSOF for the period ending December 31, 2022 was an unqualified "clean" opinion that did not disclose any questions about SCSOF's ability to continue as a going concern.

58.    When SCSOF failed to pay the quarterly payment required under the Note for the fourth quarter of 2022 and did not make any subsequent quarterly payments as required by the Note, Evans could have declared an Event of Default under the Note and demanded immediate payment of all principal and interest due under the Note.

59.    When Evans learned in the Spring of 2023 that SCSOF had not provided timely notice of its intent to extend the maturity date of the Note to January 31, 2024, Evans could have declared an Event of Default under the Note and demanded immediate payment of all principal and interest due under the Note.

60.    However, Evans did not declare Events of Default or seek immediate payment on the Note.

61.    Instead, he elected to permit SCSOF time to execute on its stated business plan to

either refinance or sell some or all of the Camperdown Project which SCSOF represented presented a reasonable likelihood that once that plan was executed SCSOF would be able to pay its obligations to Evans and other noteholders in full.

62.    In making this decision, Evans relied on the fact that Cherry Bekaert did not disclose any information regarding SCSOF's ability to continue as a going concern in its audit opinions for the years ending December 31, 2021 and 2022.

63.    Cherry Bekaert knew or should have known that Evans would rely on its audit opinions because in its advertising Cherry Bekaert specifically advertises its audit services on its website by stating "Whether you are expanding and improving operations, *attracting or securing growth or investment capital or simply negotiating more favorable terms with your existing lender*, Cherry Bekaert can help present your financial statements in the most informative and accurate manner possible." *See* https://www.cbh.com/services/assurance/audit-attestation-services/ (emphasis added).

64.    Thus, it was not only foreseeable that Evans and other potential investors and "existing lenders" would consider and rely on Cherry Bekaert's audit opinions in making decisions concerning their investments in SCSOF, Cherry Bekaert specifically advertises its auditing services for that very purpose.

65.    Cherry Bekaert also authorized SCSOF to disclose publicly, including in mandatory Securities Exchange Commission ("SEC") filings, such as SCSOF's annual Form ADV filed with the SEC and publicly available on the SEC's EDGAR website, that Cherry Bekaert performed audits of SCSOF, and that Cherry Bekaert provided unqualified audit opinions concerning SCSOF's financial statements throughout the Cherry Bekaert Audit Period.

66.    However, Cherry Bekaert knew or should have known that SCSOF had significant

operational and financial difficulties and that there were significant questions about SCSOF's ability to continue as a going concern during the Cherry Bekaert Audit Period.

67.     For example, in January 2022 a lawsuit was filed by a consultant who worked closely with SCSOF and a number of other Weir-related entities with the review and consideration of potential real estate development projects, identifying and contacting potential financing sources, and consideration of proposed financing arrangements for the projects.

68.     The lawsuit filed by the consultant alleged that those entities failed to make payments to the consultant that were required by his contract (the "Insider Complaint"). A true and correct copy of the publicly filed Insider Complaint is annexed hereto as Exhibit C.

69.     The Insider Complaint sets forth in specific detail allegations that Weir took substantial cash from his entities to pay for personal expenses resulting in the foreseeable and intended consequence that those entities are grossly undercapitalized and unable to meet their obligations as they become due.

70.     In addition, upon information and belief, SCSOF was not generating cash flows from its operations that were sufficient to pay management fees, interest expenses, and other operating expenses of SCSOF such that SCSOF would be insolvent if it was unable to sell additional promissory notes which calls into question the viability of the overall business plan for SCSOF.

71.     Such allegations, if correct, would be a direct event of default under the Note and substantively similar notes which, upon information and belief, SCSOF had issued to other investors, and would also raise significant concerns about SCSOF's ability to continue as a going concern.

72.     The Insider Complaint supported its allegations with detailed allegations discussing

specific entities, including SCSOF, relating to the Camperdown Project and specific mismanagement and other misconduct.

73.    The plaintiff in the Insider Complaint, Mr. Mack Whittle, is a former banking executive with significant experience in the industry and similar projects resulting in his being hired as a consultant. Thus, his claims should not have been taken lightly or dismissed.

74.    Rules and guidance applicable to Cherry Bekaert and its audit work, including for SCSOF, impose specific obligations and requirements on independent auditors like Cherry Bekaert that must be followed when an auditor becomes aware of allegations that a client is grossly undercapitalized, unable to meet their obligations as they become due, and potentially insolvent.

75.    The Insider Complaint was filed prior to Cherry Bekaert issuing its audit opinion for the year ended December 31, 2021, and, upon information and belief, was filed within the "subsequent event" period specifically addressed in Cherry Bekaert's audit opinion for the year ended December 31, 2021.

76.    Upon information and belief, Cherry Bekaert did not conduct a proper investigation of SCSOF to identify the Insider Complaint and its allegations.

77.    Upon information and belief, if Cherry Bekaert was aware of the Insider Complaint when it was conducting its audit work for SCSOF, it did not engage in proper audit procedures to investigate the allegations contained in the Insider Complaint, which, at a minimum, called into question the viability of SCSOF to continue as a going concern.

78.    Upon information and belief, if Cherry Bekaert did employ audit procedures to investigate the allegations contained in the Insider Complaint, it was negligent in that it did not conduct a proper investigation of the facts and circumstances alleged in the Insider Complaint.

79.    Upon information and belief, had Cherry Bekaert engaged in proper audit

procedures and/or conducted a proper investigation of the facts and circumstances alleged in the Insider Complaint it would have determined that SCSOF had, at a minimum, significant financial and operational issues that called into question its ability to continue as a going concern for 2023.

80.     Upon information and belief, had Cherry Bekaert engaged in proper audit procedures upon discovering credible allegations forth in the Insider Complaint and/or conducted a proper investigation of the facts and circumstances alleged in the Insider Complaint it could not have issued an unqualified "clean" audit opinion of SCSOF for the period ending December 31, 2022.

81.     Upon information and belief, had Cherry Bekaert engaged in proper audit procedures upon discovering credible allegations set forth in the Insider Complaint and/or conducted a proper investigation of the facts and circumstances alleged in the Insider Complaint it would have been required by applicable audit standards to, at a minimum, disclose questions regarding SCSOF's ability to continue as a going concern through the end of 2023.

82.     Further evidence that there were serious concerns about SCSOF's ability to continue as a going concern through the end of 2023 and about Cherry Bekaert's gross negligence in performing its audit of SCSOF for 2022 is the fact that SCSOF failed to pay the quarterly interest payment due on the Note in the fourth quarter of 2022.

83.     Upon information and belief, had Evans demanded payment of the Note in the Spring of 2023 when he learned that SCSOF had not given proper notice of its intent to extend the maturity date of the Note until January 31, 2024, SCSOF would have been in a position to pay all outstanding principal and interest on the Note and would have done so.

84.     After Evans acquiesced in the extension of the Note's maturity date, SCSOF failed to make the quarterly payments required on the note during 2023.

85.     However, Evans did not seek immediate payment of the Note based on these Events of Default because Evans was unaware of any information calling into question SCSOF's viability going forward or its ability to execute on its stated business plan.

86.     Upon information and belief, had Cherry Bekaert properly performed its audit of SCSOF's 2022 financial statements and properly conducted a "going concern" analysis and investigation of SCSOF, it could not have issued an unqualified "clean" audit opinion for the period ending December 31, 2022 but, rather, would have been required to disclose in its audit opinion for the period ending December 31, 2022, at a minimum, that there were questions about SCSOF's inability to continue as a going concern through the end of 2023.

87.     Had Cherry Bekaert properly conducted its audit and issued a proper, appropriate qualified audit opinion of SCSOF disclosing questions about SCSOF's viability as a going concern for 2023, Evans would not have acquiesced in SCSOF's extension of the maturity date of the note until January 31, 2024, but would have sought immediate payment on the Note, just as he did when he first received negative news about SCSOF's ability to execute its refinancing business plan in the third quarter 2023 investor update.

88.     Instead, SCSOF's quarterly investor update in the third quarter of 2023 indicating that SCSOF was unable to refinance the Camperdown Project and was under contract to sell the Greenville News Building, likely at a much lower price than previously indicated, was the first indication that the Camperdown Project was a failure, or that Evans was given any indication that SCSOF's business plan and viability as a going concern was in doubt.

89.     Once he received that update Evans engaged counsel, declared an Event of Default under the Note, and demanded immediate payment of all principal and interest due under the Note.

90. Had Evans received any information calling into doubt SCSOF's business plan or its viability as a going concern at any time earlier in 2023, including through Cherry Bekaert's audit opinion for the period ending December 31, 2022, he would have declared an Event of Default and/or demanded immediate payment of all outstanding interest and principal under the Note at that time.

91. SCSOF has defaulted on the Note in that it has failed to make required quarterly payments required by the Note, and upon information and belief other similar notes in favor of other SCSOF investors, since the fourth quarter of 2022.

92. SCSOF also defaulted under the Note because, upon information and belief, SCSOF also became unable to pay its obligations as they became due in 2022 or 2023.

93. SCSOF has defaulted on the Note in that the extended maturity date of January 31, 2024 has now passed and SCSOF did not pay the amount due under the Note on the maturity date and still has not made any payment to the IRA even though the extended maturity date has passed by more than four (4) months.

94. Further compounding the harm caused by SCSOF's defaults on the Note, in May 2023, months after SCSOF defaulted on the Note by failing to make required quarterly payments, ECW Investing obtained a mortgage on two parcels of land, with improvements, comprising the Camperdown Project (the "Weir Camperdown Mortgage") securing a promissory note for $700,000 purportedly provided by ECW Investing into another Weir-controlled entity, CAP Camperdown GVLLE News, LLC.

95. Upon information and belief, ECW Investing did not actually advance the funds purportedly supporting the Weir Camperdown Mortgage to the Camperdown Project.

96. Upon information and belief, regardless whether ECW Investing actually advanced

the funds purportedly supporting the Weir Camperdown Mortgage, Weir's and ECW Investing's conduct in placing Weir's own interests ahead of those of Weir's investors by taking the Weir Camperdown Mortgage at a time when the Weir-controlled entities involved in the ownership and development of the Camperdown Project, including SCSOF, were in default of their obligations to Weir's investors resulted in him obtaining an inequitable and unlawful advantage over other unsecured investors in the Camperdown Project.

97.     After SCSOF's Chief Compliance Officer and General Counsel confirmed in writing that there was "no hope of recovery" on the Note, Weir again placed his own interests ahead of his investors through improper self-dealing when Weir obtained an additional mortgage on the two parcels of land, with improvements, comprising the Camperdown Project (the "Weir Camperdown Additional Mortgage" and, together with the Weir Camperdown Mortgage, the ("Weir Camperdown Mortgages") in favor of his own personal investment vehicle which, upon information and belief, Weir solely owns and controls, ECW Investing, in the amount of $200,000.

98.     Upon information and belief, ECW Investing did not actually advance the funds purportedly supporting the Weir Camperdown Additional Mortgage to the Camperdown Project.

99.     Upon information and belief, regardless whether ECW Investing actually advanced the funds purportedly supporting the Weir Camperdown Additional Mortgage, Weir's and ECW Investing's conduct in placing Weir's own interests ahead of those of Weir's investors by taking the Weir Camperdown Additional Mortgage at a time when the Weir-related entities involved in the ownership and development of the Camperdown Project, including SCSOF, were in default of their obligations to Weir's investors resulted in him obtaining an inequitable and unlawful advantage over other, unsecured investors in the Camperdown project.

100.     Investor updates provided to investors in SCSOF, including the IRA, represent that

Weir-affiliated entities involved in the ownership and development of the Camperdown Project have been seeking a buyer for one of the buildings comprising the Camperdown Project, the Greenville News Building (the "Greenville News Building"), and that a sale of the Greenville News Building would be completed by the end of 2023.

101.    Upon information and belief, no sale of the Greenville News Building has closed.

102.    However, upon information and belief, although the Camperdown Project is a failure and none of the Wier-affiliated entities is or will be able to pay its creditors, Weir is still trying to sell the Greenville News Building and Weir's taking of the New Camperdown Mortgages will improperly and unlawfully deprive investors in the Camperdown Project, including investors in SCSOF, of funds that could be used to at least partially repay those investors.

**FIRST CLAIM FOR RELIEF**
*Breach of Contract*
**(Against SCSOF)**

103.    Each and every relevant and consistent allegation set forth in Paragraph 1 through Paragraph 102 hereinabove is incorporated herein as if fully set forth herein verbatim.

104.    The Note is a valid, binding contract between SCSOF and the IRA.

105.    The IRA fully performed all of its obligations under the Note.

106.    The Note required SCSOF to make quarterly payments of $3,900 to the IRA throughout the life of the Note.

107.    SCSOF has breached the Note, in that it has failed to pay any quarterly payments to the IRA since the third quarter of 2023.

108.    The Note required that SCSOF pay to the IRA all unpaid principal and accrued interest on or before, at the latest, January 31, 2024.

109.    SCSOF has breached the Note in that it has failed to pay to the IRA all unpaid

principal and accrued interest on or before January 31, 2024.

110.     The Note requires SCSOF to pay all of the IRA's collection costs with respect to the enforcement of any of SCSOF's material obligations under the Note.

111.     As a result of SCSOF's breach of the Note, the IRA has suffered damages.

112.     As a result of the foregoing, the IRA is entitled to judgment for breach of contract against SCSOF and entitled to damages in an amount to be determined at trial, but not less than $366,357.67 plus attorneys' fees and costs.

<u>**SECOND CLAIM FOR RELIEF**</u>
***Fraudulent Inducement***
**(Against Erik Weir)**

113.     Each and every relevant and consistent allegation set forth in Paragraph 1 through Paragraph 112 hereinabove is incorporated herein as if fully set forth herein verbatim.

114.     To induce Evans to invest in SCSOF through the Note Weir represented to Evans that no entity affiliated with Weir had ever defaulted on a promissory note to an investor.

115.      Upon information and belief, those representations by Weir were false when made and Weir knew they were false when he made them or recklessly disregarded their falsity.

116.     Weir's representations that no entity affiliated with him had ever defaulted on a promissory note to an investor were material to Evans's decision whether to agree to invest in SCSOF via the Note.

117.     Weir intended that his false representations that no entity affiliated with him had ever defaulted on a note to an investor would be relied upon by Evans and that they would influence and convince him to invest in SCSOF via the Note.

118.     Evans had a right to rely on Weir's representations given their relevance toEvans's decision whether to invest in SCSOF, a Weir-affiliated entity, and given Weir's superior knowledge of the

history of such entities in fulfilling their obligations to investors.

119.    Evans reasonably relied on Weir's representations that no entity affiliated with him had ever defaulted on a promissory note to an investor.

120.    Evans was ignorant of the falsity of Weir's representations when they were made to him and when he invested in SCSOF through the Note.

121.    Nor did Evans have any reason to question Weir, who had a strong reputation within the South Carolina and Greenville communities and appeared to be overseeing a project in the Camperdown Project that both appeared to be a solid investment and would also help revitalize downtown Greenville.

122.    In early July 2023, Evans had discussions with Weir during which he asked various specific questions about his various investments in Weir-related entities and projects, including SCSOF and the Camperdown Project, but Weir failed and refused to provide answers to basic questions about the status of those investments.

123.    In late July 2023, Weir became unresponsive to Evans and did not provide an expected and requested investor update as it related to various Weir-recommended investments obtained through promissory notes to Weir-affiliated entities.

124.    Then, in or about September or October 2023 various investor updates relating to Weir-affiliated investments first disclosed that there were substantial problems with certain Weir-related projects and that certain Weir-affiliated entities were suspending interest payments due in the fourth quarter of 2023.

125.    It was only after these events caused Evans to question Weir, the investments Weir recommended, including the Note, and to begin investigating Weir and the investments he recommended, that Evans learned of the Weir Default Lawsuit.

**126.**   But for Weir's false representations that no entity affiliated with him had ever defaulted on a note to an investor, Evans would not have invested in SCSOF through the Note.

**127.**   As a result of Evans's reliance on Weir's false statement, Evans agreed to invest in SCSOF through the Note.

**128.**   Weir's fraudulent representation was the proximate cause of Evans's investment in SCSOF through the IRA via the Note and the resulting damage to the IRA.

**129.**   As a result of the foregoing, the IRA is entitled to judgment for fraudulent inducement against Weir and entitled to damages in an amount to be determined at trial, but not less than $366,357.67 plus attorneys' fees and costs and punitive damages.

### THIRD CLAIM FOR RELIEF
*Negligent Misrepresentation*
**(Against Cherry Bekaert)**

**130.**   Each and every relevant and consistent allegation set forth in Paragraph 1 through Paragraph 129 hereinabove is incorporated herein as if fully set forth herein verbatim.

**131.**   Cherry Bekaert provided audits of SCSOF's financial statements for each year during the Cherry Bekaert Audit Period.

**132.**   Upon information and belief, Cherry Bekaert had a financial interest in providing the audits of SCSOF's financial statements for each year during the Cherry Bekaert Audit Period in that it was paid for its services by SCSOF.

**133.**   Upon information and belief, Cherry Bekaert issued unqualified "clean" audit opinions concerning SCSOF's financial statements for each year during the Cherry Bekaert Audit Period.

**134.**   Upon information and belief, Cherry Bekaert's unqualified "clean" audit opinions were false and misleading.

135.    Upon information and belief, for the reasons set forth above, Cherry Bekaert's unqualified "clean" audit opinions were made negligently.

136.    Upon information and belief, based on the foregoing, Cherry Bekaert's conduct constituted gross negligence.

137.    Upon information and belief, Cherry Bekaert was aware and intended that investors in SCSOF would rely on its audit opinions when making investment decisions, including decisions regarding existing investments in the form of loans to SCSOF and modifications thereto because Cherry Bekaert's own marketing materials specifically state that potential clients should engage Cherry Bekaert as auditors for the specific reason that Cherry Bekaert's work can assist clients in negotiating revised financing terms with lenders.

138.    Upon information and belief, Cherry Bekaert was aware and intended that investors to SCSOF would rely on its audit opinions when making investment decisions, including because Cherry Bekaert is specifically listed as the auditor in the SCSOF ADV filing with the SEC and these same filings note that the audited financial statements are shared with investors.

139.    As a result, Cherry Bekaert owed a duty to Evans to communicate truthful and accurate information to Evans and the IRA concerning SCSOF's financial condition and its ability to continue as a going concern in connection with Cherry Bekaert's audits of SCSOF's financial statements and its audit opinions during the Cherry Bekaert Audit Period.

140.    For the reasons set forth herein, Cherry Bekaert's unqualified "clean" audit opinions for the periods ending December 31, 2021, and 2022 were false and misleading.

141.    Evans reasonably relied on Cherry Bekaert's unqualified "clean" audit opinions concerning SCSOF's financial statements for the periods ending December 31, 2021 and December 31, 2022 when he abstained from seeking immediate payment of the Note based on SCSOF's failure to make quarterly payments as required by the Note beginning in the fourth

quarter of 2022 and in consenting the SCSOF's extension of the maturity date of the Note until January 31, 2024 when, as set forth above, SCSOF did not have the right to unilaterally extend the maturity date.

142.    Upon information and belief, had Cherry Bekaert properly performed its audits it would have been required, at a minimum, to disclose questions in its audit opinions during the Cherry Bekaert Audit Period regarding SCSOF's ability to continue as a going concern.

143.    Had Cherry Bekaert disclosed questions regarding SCSOF's ability to continue as a going concern Evans would have declared an Event of Default under the Note when SCSOF failed to make the required quarterly payment to the IRA in the fourth quarter of 2022.

144.    Had Cherry Bekaert disclosed questions regarding SCSOF's ability to continue as a going concern Evans would have demanded immediate payment of all amounts due under the note on January 31, 2023, or shortly thereafter.

145.    Upon information and belief, had declared Events of Default under the Note when SCSOF failed to make the required quarterly payment in the fourth quarter of 2023 and sought immediate payment of all amounts due under the Note at that time, the IRA would have received payment of all amounts due under the Note.

146.    Upon information and belief, had Evans demanded full payment based on the passage of the Maturity Date on January 31, 2023, the IRA would have received full payment of all amounts due under the Note.

147.    As a result of the foregoing the IRA has suffered damages.

148.    As a result of the foregoing, the IRA is entitled to judgment against Cherry Bekaert and entitled to damages in an amount to be determined at trial, but not less than $366,357.67 plus attorneys' fees and costs and punitive damages.

**FOURTH CLAIM FOR RELIEF**
*Unjust Enrichment/Constructive Trust*
**(Against Weir and ECW Investing)**

149.    Each and every relevant and consistent allegation set forth in Paragraph 1 through Paragraph 148 hereinabove is incorporated herein as if fully set forth herein verbatim.

150.    Upon information and belief, the Weir Camperdown Mortgages are not supported by funds actually contributed by ECW Investing to the Camperdown Project.

151.    Even if the Weir Camperdown Mortgages are supported by funds actually contributed by ECW Investing, they resulted from fraud, bad faith and an abuse of confidence as set forth above, giving rise to an obligation in equity to make restitution.

152.    Even if the Weir Camperdown Mortgages are supported by funds actually contributed by ECW Investing, permitting ECW Investing to receive payment on the Weir Camperdown Mortgages at a closing of a sale of all or any part of the Camperdown Project would result in ECW Investing and Weir obtaining money which does not equitably belong to them and which they cannot in good conscience retain or withhold from the IRA, which is beneficially entitled to it as a result of the fact that the IRA was induced to invest in the Camperdown Project through the Note based on fraud and a breach of trust.

153.    Any funds paid to ECW Investing on account of the Weir Camperdown Mortgages can easily be traced.

154.    As a result of the foregoing, the IRA is entitled to the creation of a constructive trust with respect to any money paid pursuant to the Weir Camperdown Mortgages and an injunction directing that at any closing of a sale of all or part of the Camperdown Project any monies to be paid on account of the Weir Camperdown Mortgages must be paid into the Court or into an escrow account, held in constructive trust until the claims in this action are fully resolved

and, if the IRA prevails on its claims against Weir and ECW Investing, that such funds be paid to the IRA in full or partial payment of all amounts awarded to the IRA in this action.

### FIFITH CLAIM FOR RELIEF
*Violation of Sections 27-23-10 through 27-23-90*
**(Against Weir and ECW Investing)**

155.    Each and every relevant and consistent allegation set forth in Paragraph 1 through Paragraph 154 hereinabove is incorporated herein as if fully set forth herein verbatim.

156.    The Weir Camperdown Mortgages violate the provisions of Sections 27-23-10 through 27-23-90, CODE OF LAWS OF SOUTH CAROLINA, 1976, in that the Weir Camperdown Mortgages constitute a grant, alienation, bargain, transfer, and conveyance of an interest in land, by writing or otherwise, for the intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures and must, therefore, be deemed void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding as to such persons.

157.    The Weir Camperdown Mortgages were not made upon or for good consideration.

158.    The IRA is entitled to a judgment declaring that the Weir Camperdown Mortgages are clearly and utterly void, frustrate and of no effect as to them and for an entry of judgment against ECW Investing and all other parties to such mortgages and who knowing of them, or any of them, wittingly or willingly put in use, avow, maintain, justify or defend them, or any of them, as true, simple and done, had or made bona fide or upon good consideration, of or to the disturbance or hindrance of the purchaser or purchasers, lessees or grantees, their heirs, successors, executors, administrators or assigns or such as have or shall lawfully claim anything by, from or under them, or any of them, in an amount equal to one year's value of the lands encumbered by the Weir Camperdown Mortgages one moiety whereof shall be for the use of the State of South Carolina and the other moiety to Evans and IRA.

## FIFITH CLAIM FOR RELIEF

### *Declaratory Judgment Pursuant to 28 U.S.C. § 2201*
**(Against Weir and ECW Investing)**

**159.** Each and every relevant and consistent allegation set forth in Paragraph 1 through Paragraph 158 hereinabove is incorporated herein as if fully set forth herein verbatim.

**160.** This action involves the rights of SCSOF to the benefit of the Weir Camperdown Mortgages with respect to the Camperdown Project.

**161.** A ripe controversy exists with respect to ECW Investing's right to the benefit of the Weir Camperdown Mortgages based upon the following: (1) Weir, who controls both ECW Investing and the mortgagor with respect to the Weir Camperdown Mortgages fraudulently induced the IRA to invest in the Camperdown project through the Note as set forth herein; (2) upon information and belief, the Weir Camperdown Mortgages are not supported by funds actually contributed by ECW Investing to the Camperdown Project; (3) even if the Weir Camperdown Mortgages are supported by funds actually contributed by ECW Investing, they were given in favor of ECW Investing at a time when other Weir-affiliated companies and investments were in default and had been acknowledges by SCSOF's General Counsel to have no "no recovery possibility"; and (4) as a result of the foregoing, permitting ECW Investing to receive payment on the Weir Camperdown Mortgages at a closing of a sale of all or any part of the Camperdown Project would result in ECW Investing and Weir obtaining money which does not equitably belong to them but rightfully belongs to the IRA and other unsecured investors in the Camperdown Project.

**162.** The IRA seeks a declaratory judgment that the Weir Camperdown Mortgages are not valid mortgages for the reasons set forth herein.

**163.** As a result of the foregoing, the IRA seeks a declaratory judgment that the Mortgages are invalid and of no legal effect.

**WHEREFORE**, Plaintiff, Ronald Evans, for the benefit of The Ronald Evans IRA account #1713313, prays that this Court enter judgment in his favor as follows:

a.      Awarding compensatory damages in an amount to be determined at trial but not less than $366,357.67;

b.      Awarding the declaratory and other relief sought herein;

c.      Awarding Plaintiff its costs and disbursements plus attorneys' fees;

d.      Awarding Plaintiff punitive damages against Weir and Cherry Bekaert; and

e.      Granting such other relief as the Court deems just and proper.

Respectfully submitted,

**PRITCHARD LAW GROUP, LLC**

*/s/ Edward K. Pritchard, III*
Edward K. Pritchard, III, Esq.
(Federal ID No. 4790)
8 Cumberland Street, Suite 200 (29401)
Post Office Box 630
Charleston, South Carolina 29402
(843) 722-3300 Telephone
(843) 722-3379 Facsimile
E-Mail: epritchard@pritchardlawgroup.com

*ATTORNEY FOR PLAINTIFF RONALD EVANS F/B/O THE RONALD EVANS IRA ACCOUNT #17133*

June 7, 2024
Charleston, South Carolina